## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH RODNEY DOLE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 15 C 11874 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| RANDY PFISTER, Warden, | ) | |
| Stateville Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

More than a decade after a jury found petitioner Joseph Rodney Dole ("Dole") guilty of the aggravated kidnapping and first-degree murders of two men, he filed this petition for writ of habeas corpus. Defendant argues that the petition is untimely. For the reasons set forth below, the Court dismisses the petition with prejudice.

## I.    BACKGROUND

In early April 1998, Jose Romero ("Romero") and Jose Segura ("Segura") were beaten to death and their bodies were burned in a stolen van. By the end of April 1998, petitioner Dole was arrested in Florida, where he had gone to hide. Dole was charged with the aggravated kidnapping and first-degree murders of both victims on an accountability theory. The State's theory was that Dole, as leader of the Pimptown Latin Kings, hoped Romero and Segura would tell him the location of Steven Venegas ("Venegas"), a rival gang member whom Dole wanted to silence before Venegas could be called as a witness against a Pimptown Latin King accused of murder. A jury convicted Dole of all four counts, and a judge sentenced him to two concurrent terms of natural life imprisonment for the murders and two consecutive terms of 30 years for the kidnappings. [Docket 11-1 at 11].

A number of witnesses testified at Dole's trial. A witness from the Chicago Police Department's forensic services team testified that early on the morning of April 4, 1998, he was called to a vacant lot where he saw a partially burned white minivan containing two charred bodies. [Docket 11-1 at 3]. A bomb and arson expert testified that the cause of the fire was an accelerant poured into the van and then ignited. [Docket 11-1 at 3]. He also testified that he had found partially burned gloves (one turned partially inside out) at the scene. [Docket 11-1 at 3]. A police detective testified that the minivan had been stolen from a woman in Island Lake and that the cause of Romero's and Segura's deaths had been strangulation. [Docket 11-1 at 3]. That police detective also testified that he had figured out that the victims were Romero and Segura when he spoke to a Sergeant about two missing persons, whose girlfriends were able to identify the bodies. [Docket 11-1 at 3-4].

Another detective testified as to how the investigative trail led to Dole. Specifically, the detective testified that, during the course of his investigation, he interviewed George Hernandez ("Hernandez"), who identified the home (in Cicero) of Roberto Hurtado ("Hurtado") as the location "where the crimes first took place." [Docket 11-1 at 4]. He testified that, on April 11, 1998, he and other police officers went to Hurtado's home, where Hurtado and Hurtado's girlfriend, Lorena Bueno ("Bueno"), were present. [Docket 11-1 at 4]. The officers arrested Hurtado and later Raul Dorado ("Dorado") and Noel Deleon ("Deleon"). [Docket 11-1 at 4]. Bueno testified that Hurtado, Dorado, Deleon and Dole were all members of the Pimptown Latin Kings. [Docket 11-1 at 4-5]. The detective testified that, on April 17, 1998, police located and seized Dole's red Dodge Durango from a Jewel parking lot in Hoffman Estates. [Docket 11-1 at 4].

2

Hernandez testified that Dole had been the leader of the Pimptown Latin Kings from April 1997 (when the prior leader had been arrested) until April 1998. [Docket 11-1 at 6]. Hernandez testified that, in March 1998, at a meeting of the Pimptown Latin Kings, Dole told the gang members they needed to find Steven Venegas because he was going to testify against other Pimptown Latin Kings. [Docket 11-1 at 6].

Lorena Bueno testified that on April 2, 1998, she was at home with Hurtado and her four children. [Docket 11-1 at 5]. At about 10:30 p.m., Dole telephoned Hurtado on his cell phone, and Bueno heard Dole say "stay up." [Docket 11-1 at 5]. Then Durado called, and Bueno heard Hurtado give Durado their address. [Docket 11-1 at 5]. Hurtado told Bueno to go into the bedroom with the children and not come out. [Docket 11-1 at 5]. From the bedroom, Bueno heard the voices of Hurtado, Dorado, Deleon and another man whose voice she did not recognize. [Docket 11-1 at 5]. Bueno heard the sound of someone being hit. [Docket 11-1 at 5]. About half an hour later, Bueno heard Dole's voice, the sound of duct tape being removed from a roll and the sound of someone being hit or punched. [Docket 11-1 at 5]. Although Bueno turned up the radio and put a pillow over her head, she continued to hear the sound of someone being beaten and heard Dole say "shut up." [Docket 11-1 at 5].

Bueno testified that, eventually, she heard the sound of the men carrying something heavy to the bathroom. [Docket 11-1 at 5]. Hurtado entered the bedroom and handed her $500. Next, Dole entered the bedroom and told Bueno that he was taking Bueno and the children to a hotel. [Docket 11-1 at 5]. Dole drove Bueno and the children to a hotel in his red Dodge Durango and told her that, if anyone asked, to answer that neither Bueno nor Hurtado had left their home that night. [Docket 11-1 at 6]. Bueno used the money Hurtado had given her to pay

for a room.  [Docket 11-1 at 6].  About 24 hours later, Hurtado collected Bueno and the children from the hotel.  [Docket 11-1 at 6].

Hernandez testified that at about 11:30 p.m. on April 3, 2021, Dole called him and said he needed Hernandez's expertise, which Hernandez took to mean help stealing a vehicle. [Docket 11-1 at 6].  Dole picked up Hernandez in Dole's red Dodge Durango.  [Docket 11-1 at 6].  (Hernandez's girlfriend also testified to seeing Hernandez leave that night in Dole's red Dodge Durango and to seeing Hernandez take a coat hanger with him.  [Docket 11-1 at 8].) Hernandez testified that Dorado, Hurtado and Deleon were also in Dole's Dodge Durango. [Docket 11-1 at 6].

Hernandez testified that Dorado told him they had two dead bodies and needed a minivan.  [Docket 11-1 at 7].  Dole drove to an apartment complex where the men found a minivan with an unlocked door.  [Docket 11-1 at 7].  Hernandez started the minivan and followed the red Dodge Durango to Hurtado's apartment, where he saw, in a closet, two bodies—wrapped in plastic and duct tape—that looked "like mummies."  [Docket 11-1 at 7]. Hurtado told Hernandez that Segura and Romero had not wanted to die so they had been pistol whipped and beaten.  [Docket 11-1 at 7].  Hernandez testified that Dole gave the men cloth gloves, which they wore while carrying the bodies to the minivan.  [Docket 11-1 at 7]. Hernandez testified that he drove the van to a vacant lot, where Dorado used a screwdriver to rip the plastic off the bodies, over which Deleon poured gasoline.  [Docket 11-1 at 8].  The men lit a matchbook on fire and threw it in the minivan, which ignited a fire into which the men threw their gloves.  [Docket 11-1 at 8].

Hernandez testified that Dole drove him home and said that, if anyone asked, Hernandez should say he was never with them. [Docket 11-1 at 8]. Hernandez's girlfriend testified that Hernandez returned home between 3:00 and 4:00 a.m. [Docket 11-1 at 8].

Bueno testified that, on April 10, 1998, the day before Hurtado's arrest, Dole came to their home and told Hurtado that the police were looking for him. [Docket 11-1 at 6]. Two days earlier, according to the testimony of Nathan Steffen ("Steffen") (another Pimptown Latin King who had moved to Florida), Dole telephoned Steffen, told Steffen the neighborhood was "hot" with police due to the murders of Romero and Segura and told Steffen he was coming to Florida. [Docket 11-1 at 9]. Steffen testified that Dole arrived at Steffen's home in Florida the week of April 20, 1998. [Docket 11-1 at 9].

Steffen testified that after Dole arrived in Florida, Dole told him that they (he, Hurtado, Deleon and Dorado) should not have been caught, because they had done it "so slick." [Docket 11-1 at 9]. Dole told Steffen they had lured Segura and Romero under the guise of a drug deal and that, once the men were at Hurtado's home, they had tied the men up and beaten and strangled them. [Docket 11-1 at 10]. Dole told Steffen he had left marks on the victims' faces from punching them. [Docket 11-1 at 9]. Steffen testified that Dole told him they had put the bodies in the bathroom to drain the blood and then put the bodies in a stolen van that they burned. [Docket 11-1 at 10]. Dole told Steffen that he planned either to go to Mexico for plastic surgery or to return to Chicago and kill the remaining witnesses. [Docket 11-1 at 10]. Steffen helped Dole hide at Steffen's friend's home in Bonita Springs, Florida. [Docket 11-1 at 9].

An FBI Agent testified that he had been working in Fort Myers, Florida when, on April 30, 1998, he received a federal warrant to search Steffen's house. [Docket 11-1 at 8]. The FBI Agent learned from a Chicago Police Officer that the Chicago Police Department suspected that

Dole was staying with Steffen. [Docket 11-1 at 8]. A lieutenant from the Lee County Sheriff's

Office in Florida testified that Steffen was stopped in a taxi in Ft. Myers. [Docket 11-1 at 9].

The taxi driver told the lieutenant that he had picked up Steffen at a residence in Bonita Springs.

[Docket 11-1 at 9]. When the police searched that house in Bonita Springs, they found Dole on

the floor of a bedroom closet and arrested him. [Docket 11-1 at 9].

On direct appeal, the First District affirmed. Among other things, the Illinois Appellate

Court stated:

> The State argues that they have proven the defendant guilty under a theory
> of accountability. Under the statute, a person is accountable for the actions of
> another when '[e]ither before or during the commission of an offense, and with
> the intent to promote or facilitate such commission, he solicits, aids, abets, agrees
> or attempts to aid, such other person in the planning or commission of the
> offense.' 720 ILCS 5/5-2(c) (West 2000).
>
> Active participation is not a requirement for imposing liability under a
> theory of accountability. Also, the intent to promote or facilitate the commission
> of a crime can be shown by evidence that the defendant shared the criminal intent
> of the principal or by evidence that there was a common design or community of
> unlawful purpose. 'Circumstances especially pertinent to the establishment of a
> common design include: presence at the scene of the crime without disapproval
> or opposition; a continued close association with perpetrators after the criminal
> act; a failure to report the incident to the authorities; and/or the subsequent
> concealing or destroying of evidence of the crime.'
>                                        * * *
> In the instant case, the testimony revealed that the defendant was present while
> the victims were beaten to death. The defendant was instrumental in removing
> the witness, Lorena Bueno, from the scene and in disposing of the victim's
> bodies. We agree with the State that the defendant never reported the crime to the
> police, he continued to associate with the co-defendants, he did not oppose the
> crime, and he participated in destroying the evidence. After carefully reviewing
> the record below and viewing the evidence in the light most favorable to the
> prosecution, we find that the State proved the defendant's guilt beyond a
> reasonable doubt.

*Illinois v. Dole,* 1-01-0296, Slip Op. at 21-22, 24 (Nov. 26, 2002) (internal citations omitted)/

Docket 11-1 at 21-22, 24.

On November 19, 2004, the Illinois Supreme Court denied Dole's motion for leave to file a late petition for leave to appeal.  [Docket 11-2 at 1].  On February 14, 2005, the Supreme Court of the United States notified Dole that his petition for writ of certiorari was being returned to him, because the "order dated November 19, 2004 from the Illinois Supreme Court does not appear to be a denial of a timely filed petition for discretionary review."  [Docket 11-3 at 1].

On or about May 4, 2005, Dole filed in the Circuit Court of Cook County his first petition for post-conviction relief.  [Docket 11-4].  Dole's petition quoted liberally from the trial transcript and was sent from his prison in Tamms, Illinois.  [Docket 11-4 at 2, 3, 11-18].  Dole included an affidavit with his post-conviction petition.  In it, he averred, among other things:

> 12.     That both Sam Shim and Richard Beuke represented me during my trial.
>                         *  *  *
> 14.     That I have been unable to obtain all of my records from both Sam Shim and Richard Beuke.  Sam Shim informed my family that he didn't have any of my transcripts, discovery, etc., and that he returned everything to Richard Beuke's office.  My mother, Sandra Lawrence, went down to Richard Beuke's office to get my records after he refuse [sic] to mail them to either myself or my mother after months of requesting this.  They allowed her to copy what they claimed was my entire filed, which she did, but there were several things missing, namely the trial transcripts, a lot of the discovery and several important motions, such as the motion for new trial.

[Aff. ¶¶ 12, 14/Docket 11-4 at 23].  In June 2005, the Circuit Court dismissed petitioner's petition as "frivolous and patently without merit."  [Docket 11-5 at 2].

On May 21, 2007, the Illinois Appellate Court affirmed the dismissal of Dole's post-conviction petition.  [Docket 11-5].  The Appellate Court, however, modified Dole's sentence, stating that, because Dole would already be spending his life in prison due to the two concurrent life sentences for murder, he could not serve consecutively his 30-year sentences for kidnapping.

[Docket 11-5 at 22]. Accordingly, the Appellate Court ordered Dole's sentences to run concurrently. [Docket 11-5 at 22].

On September 30, 2009, the Illinois Supreme Court denied Dole's petition for leave to appeal. [Docket 11-6]. Dole filed a motion for reconsideration. [Docket 11-7]. The Illinois Supreme Court denied that motion, but it ordered the Appellate Court to reconsider its decision in light of *People v. Hodges*, 234 Ill.2d 1204 (Ill. 2009). [Docket 11-7]. On March 26, 2010, the Illinois Appellate Court issued its next decision, in which it again affirmed dismissal of Dole's post-conviction petition and ordered the sentences to run concurrently. [Docket 11-8]. The Illinois Supreme Court again denied Dole's motion for leave to appeal and again ordered the Illinois Appellate Court to reconsider its decision in light of a new case, this time *People v. Petrenko*, 237 Ill.2d 490 (Ill. 2010). [Docket 11-9]. On December 23, 2010, the Illinois Appellate Court issued its next decision, in which it again affirmed the dismissal of Dole's post-conviction petition. [Docket 11-10 at 22]. It also noted that the Illinois Supreme Court, in *Petrenko*, had recognized the value of consecutive sentences. [Docket 11-10 at 21-22]. Accordingly, the Illinois Appellate Court affirmed the Circuit Court's original consecutive sentence of Dole. [Docket 11-10 at 21-22]. The Illinois Supreme Court, on May 25, 2011, denied Dole's petition for leave to appeal. [Docket 11-11].

In or about May 2012, Dole filed in the Circuit Court of Cook County a motion for leave to file a successive post-conviction petition. [Docket 11-12]. Dole argued, among other things:

> Hernandez's credibility was repeatedly impeached—he was a drug addict and alcoholic who was both drunk and high on cocaine for days prior to and during the timeline of the crimes, he had a [sic] extensive criminal history, made numerous conflicting statements, received a deal of only five years in exchange for his testimony, and failed a lie detector test. The State falsely rehabilitated his credibility though by having him testify that he had only failed the polygraph examination a little and had mostly passed. The defense had repeatedly requested

the polygraph examiner's worksheet to dispute this, but the State suppressed them.

Petitioner has recently learned why they were suppressed. Because the worksheet proves unequivocally that Hernandez's testimony about mostly passing the test and only failing where he lied about trying to light the matches, was false. By filing an Illinois FOIA request with the Chicago Police Department under the amended FOIA, Petitioner received the worksheet that the State refused to disclose, and which Petitioner had tried unsuccessfully to get before the FOIA was amended. His prior letters and requests to the CPD and other police departments were routinely ignored. . . .

The polygraph examiner only asked Hernandez whether he had been involved in the murders and kidnappings. Hernandez answered "no" and the result was "deception indicated."

[Docket 11-12 at 2].

The Circuit Court of Cook County dismissed Dole's motion for leave to file a successive

petition for post-conviction relief. On April 9, 2015, the Illinois Appellate Court affirmed.

[Docket 11-13]. The Illinois Appellate Court stated, among other things:

To succeed on a claimed *Brady* violation, a defendant must demonstrate: (1) the undisclosed evidence is favorable because it is either exculpatory or impeaching; (2) the evidence was either willfully or inadvertently suppressed by the State; and (3) the accused was prejudiced because the evidence is material to guilt or innocence. . . .

First, defendant fails to show that the State willfully or inadvertently suppressed Hernandez's worksheet in violation of *Brady*. Our review of the record reveals that prior to trial, defense counsel requested the worksheet and discussed admitting the worksheet into evidence. The State responded that it had yet to receive the worksheet. The parties then agreed to discuss the issue prior to Hernandez's testimony; however, there is no indication in the record that the issue was again addressed at trial. The record clearly shows that both parties were aware of the polygraph worksheet. Defendant's claim of a *Brady* violation is not supported by the fact that the State never pursued the material. Because the worksheet was never again referenced by either party, it is reasonable to assume that defense counsel abandoned pursuit of the document. Even so, there was nothing to prevent defendant from raising the issue either on direct appeal or in his initial postconviction petition. Therefore, defendant's contention fails the second prong of the *Brady* test. Accordingly, because we find no *Brady* violation, defendant has failed to show cause.

Even assuming the defendant could show cause, defendant cannot demonstrate that he was prejudiced as a result of the unavailability of the worksheet. A review of the worksheet indicates that Hernandez was deceptive during the polygraph exam, and had the worksheet been made available, defense counsel may have attempted to use it to impeach Hernandez by contradicting his testimony that he was 'mostly telling the truth' during the exam. However, we do not find that the omission of evidence that merely impeaches a witness rises to the level of an error that so infected defendant's trial that the resulting conviction violated due process. While defendant is correct that Hernandez's testimony was essential to the State's case; both Steffen and Bueno also provided credible testimony that established that defendant participated in the murders.

Steffen testified that defendant admitted to him that he, Hurtado, DeLeon, and Dorado lured Romero and Segura to Hurtado's apartment under the guise of a drug deal. Once at Hurtado's apartment, they tied the men up and then beat and strangled them in an effort to locate Venegas. Defendant admitted to putting the bodies of Romero and Segura in a bathtub and eventually burning the bodies of Romero and Segura in a stolen van. Defendant also told Steffen that Bueno was in the apartment during the beatings. Additionally, Bueno testified that she was in her bedroom when she heard defendant's voice in her living room and the sounds of someone being hit. She also heard the sound of duct tape being pulled off of its roll, and the sound of something heavy being carried toward the bathroom. . . . Following the beatings, defendant took Bueno and her children to a motel and told her that if anyone asked she was to tell them that neither she nor Hurtado left the apartment that night. *The presence of the worksheet at trial would not have contradicted either the testimony of Steffen or Bueno. Additionally, none of the questions asked during the polygraph exam were material to defendant's guilt or punishment.* In fact, Hernandez never mentioned defendant's role in the murders during the exam. Because there is no reasonable probability that the availability of the worksheet at trail would have resulted in a different outcome, defendant fails to show prejudice.

[Docket 11-13 at 5-6 (emphasis added)/*People v. Dole*, Case No. 12-2305, 2015 IL App (1st) 122305-U at ¶¶ 26-29 (emphasis added) (internal citations omitted)]. The Illinois Supreme Court denied Dole's petition for leave to appeal. [Docket 11-14].

In late December 2015, Dole filed this federal habeas petition. Dole originally filed his petition *pro se*, but he has been represented by counsel since December 2016, when a professor with whom Dole had been corresponding hired him counsel. [Docket 92 at 2].

II.     **DISCUSSION**

A.     **Limitations period**

Respondent argues that Dole's habeas petition should be dismissed as untimely.  By

statute:

> (1) A 1-year limitation period shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run *from the latest of*—
>
>> (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>>
>> (B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>>
>> (C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>>
>> (D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2)  The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d) (emphasis added).  The 1-year limitation period is subject to equitable

tolling.  *Holland v. Florida*, 560 U.S. 631 (2010).

### 1. § 2244(d)(1)(A)

Under § 2244(d)(1)(A), the time for filing runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). In Dole's case, that date was December 31, 2002. *See Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012) ("the judgment becomes final 'at the expiration of the time for seeking such review'—when the time for pursuing direct review in this Court, or in the state court, expires"). That is so, because the Illinois Appellate Court issued its decision on direct review on November 26, 2002. The time for Dole to file a petition for leave to appeal with the Illinois Supreme Court expired December 31, 2002. Ill. S.Ct. Rule 315(b)(1). Dole did not file by that time. Thus, the 1-year limitation period, if § 2244(d)(1)(A) provides the latest date, began to run on December 31, 2002 and expired on December 31, 2003.[1]

Under § 2244(d)(2), the time during which a "properly filed" petition for State collateral review is "pending" tolls that limitation period. Neither of petitioner's post-conviction petitions were pending before the expiration (the earliest petition having been filed in May 2005), so neither tolled the expiration. *See, e.g., Teas v. Endicott*, 494 F.3d 580, 582-83 (7th Cir. 2007). Petitioner's successive petition, even had it been pending before the expiration, would not have tolled the limitation period, because it was not properly filed. *Pace v. DiGuglielmo*, 544 U.S.

---

[1] Dole does not argue (and nothing in the statute would support an argument) that Dole's subsequently-filed petition (which was denied) for leave to file a late petition for leave to appeal somehow extended the deadline. *See Alexander v. Yurkovich*, Case No. 10 C 3475, 2013 WL 139872 at *2-3 (N.D. Ill. Jan. 10, 2013) ("[Petitioner] then had thirty-five days, or until March 3, 2008, to file a timely petition for leave to appeal to the Illinois Supreme Court. . . . He did not do so; thus, his conviction became final under § 2244(d)(1)(A) on March 3, 2008, and he had one year, or until March 3, 2009, to file his federal habeas petition. . . . The fact that [petitioner] filed a motion for leave to file a late petition for leave to appeal with the Illinois Supreme Court . . ., which was ultimately denied, does not alter this conclusion.").

408, 417 (2005) (if a state court "reject[s] petitioner's PCRA petition as untimely, it was not

'properly filed,' and he is not entitled to statutory tolling under § 2244(d)(2)).

>    **2.**   **§ 2244(d)(1)(B)-(D)**

Neither party suggests that either § 2244(d)(1)(B) (when a State prevents a petitioner

from filing) or § 2244(d)(1)(C) (when the Supreme Court recognizes a new right) applies to this

case.  Thus, neither section offers petitioner a "lat[er]" date than § 2244(d)(1)(A).

Dole, however, argues that § 2244(d)(1)(D) applies and offers a later date from which the

1-year limitation period would run.  Under that section, the 1-year period runs from "the date on

which the factual predicate of the claim or claims presented could have been discovered through

the exercise of due diligence."  28 U.S.C § 2244(d)(1)(D).

Dole first argues that, under § 2244(d)(1)(D), the 1-year limitation period runs from

December 17, 2014, the date he received "complete polygraph worksheets for Hernandez."

[Docket 31 at 11].  The Court disagrees.  What Dole received on December 17, 2014 was merely

corroborating evidence; December 17, 2014 was not the date he discovered the factual predicate.

"Section 2244(d)(1)(D) does not restart the time when corroborating evidence becomes

available; if it did, then the statute of limitations would fail in its purpose to bring finality to

criminal judgments."  *Escamilla v. Jungwirth*, 426 F.3d 868, 871 (7th Cir. 2005), *abrogated on

other grounds McQuiggen v. Perkins*, 569 U.S. 383 (2013); *Rivera v. Pollard*, 504 Fed. Appx.

502, 505 (7th Cir. 2013) ("the date that [petitioner] discovered the factual predicate for his claim

was not . . . in 2009 when the state trial court compiled a record of evidence[.] . . . Instead,

[petitioner] discovered the factual predicate for his claim . . . in 2001 when he read the police

report[.]").

The record is clear that Dole was aware of the factual predicate no later than May 2012, because that is when he included this issue in his petition for leave to file a successive post-conviction petition. On or about May 2012, Dole filed in the Circuit Court of Cook County a motion for leave to file a successive post-conviction petition. [Docket 11-12]. In that May 2012 petition, Dole argued, among other things:

> Hernandez's credibility was repeatedly impeached. . . . The State falsely rehabilitated his credibility though by having him testify that he had only failed the polygraph examination a little and had mostly passed. The defense had repeatedly requested the polygraph examiner's worksheet to dispute this, but the State suppressed them.
>
> Petitioner has recently learned why they were suppressed. Because the worksheet proves unequivocally that Hernandez's testimony about mostly passing the test and only failing where he lied about trying to light the matches, was false. By filing an Illinois FOIA request with the Chicago Police Department under the amended FOIA, Petitioner received the worksheet that the State refused to disclose[.] . . .
>
> The polygraph examiner only asked Hernandez whether he had been involved in the murders and kidnappings. Hernandez answered "no" and the result was "deception indicated."

[Docket 11-12 at 2]. Thus, the record is clear that Dole knew the factual predicate no later than May 2012. The statute of limitations under § 2244(d)(1)(D), thus, expired one year later, i.e., no later than May 2013. Dole did not file his federal habeas petition until more than two years later, in December 2015. That was too late.[2]

Dole argues in the alternative that his receipt of several documents in January 2012 restarted the clock under § 2244(d)(1)(D). (Plf. Am. Resp. at 9/Docket 31 at 13). The Court need not consider whether the receipt of these documents restarted the clock, because, even if it

---

[2] Dole concedes that the petition for leave to file a successive post-conviction action did not toll the statute of limitations, because it cannot be deemed "properly filed." [Pet. Am. Resp. at 12/Docket 31 at 16; *see also* Pet.Reply Brief at 5/Docket 94 at 5].

did, the deadline would have been January 2013, more than two years before Dole filed his federal habeas petition.

Under § 2244(d)(1), Dole's habeas petition was untimely. Still, Dole's petition could be saved by equitable tolling.

### B.     Equitable tolling

Dole next argues that equitable tolling should apply to his claim. Defendant disagrees. A petitioner is:

> 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently; and (2) that some extraordinary circumstance stood in his way' and prevented timely filing.

*Holland*, 560 U.S. at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). Petitioner has the burden of establishing these two elements. *Tucker v. Kingston*, 538 F.3d 732, 735 (7th Cir. 2008). "[T]olling is rare; it is 'reserved for extraordinary circumstances far beyond the litigant's control that prevented timely filing.'" *Socha v. Boughton*, 763 F.3d 674, 684 (7th Cir. 2014) ("We have properly enforced the high bar that the Court has erected in this area, but by the same token we have not set that bar so high as to make equitable tolling impossible.").

The plain meaning of extraordinary is unusual and rare. That is why "'garden variety' claims of excusable neglect" are "too common to be called 'extraordinary'" and why a court "cannot give the label 'extraordinary' to a trait that applies to 92% of prisoners filing petitions.'" *Socha*, 763 F.3d at 685. Courts considering equitable tolling are "to evaluate the entire hand" a "petitioner was dealt" rather than look for a "single trump card." *Socha*, 763 F.3d at 686. Nonetheless, certain facts can take a petitioner's situation from ordinary to extraordinary. In *Socha*, for example, the Seventh Circuit was persuaded by the fact that petitioner had alerted the district court *before the deadline* of his difficulty obtaining files from his prior counsel. *Socha*,

15

763 F.3d at 687 ("Socha approached the court before his deadline expired, not after; this fact *alone* sets his case apart from the great majority of those involving untimely filings.") (emphasis added). In addition, Socha had requested his file multiple times from his attorney and twice from his attorney's supervisor, because his attorney had ignored the supervisor's direction to provide the file. Ultimately, the supervisor "took matters into his own hands" and provided the file. *Socha*, 763 F.3d at 679-80.

Dole argues that he suffered extraordinary circumstances, because he was housed at Tamms Supermax Penitentiary "in extreme segregation" for "more than a decade." [Docket 31 at 19]. Dole says he was there from March 2002 for a period of about ten years. [Docket 31 at 9]. Dole's time there does not appear to have impacted his ability to file documents with courts. The record reflects that Dole regularly sent courts documents during this period. Specifically, he sent: a motion to the Illinois Supreme Court for leave to file a late petition for leave to appeal; a petition for certiorari to the Supreme Court of the United States; a petition for post-conviction relief to the Circuit Court of Cook County; an appeal of the Circuit Court's denial of that petition; at least three petitions for leave to appeal to the Illinois Supreme Court and a motion for reconsideration to the Illinois Supreme Court. In any case, Dole's incarceration at Tamms did not affect his ability to file a federal habeas petition after he received the documents he says he received in 2012. By the time Dole filed his May 2012 motion for leave to file a successive post-conviction petition, he was no longer housed at Tamms. [Docket 11-12 at 6].

Dole also argues that his ability to file his federal habeas petition was impacted by his inability to obtain his case file from the attorney who defended him at trial. [Docket 31 at 18]. The record does not back him up. Dole stated in a 2005 affidavit that his counsel had allowed his mother to copy his case file, although a few items had been missing from it. [Docket 11-4 at

16

23].  Dole does not say how any of the missing items impacted his ability to file a federal habeas petition.  It is clear, though, that Dole would not have needed his case file to know that he needed to obtain the Hernandez polygraph documents.  Those documents were discussed at his trial. [Docket 11-13 at 5-6].  Dole admits he knew about the polygraph documents during the trial. Specifically, Dole submitted an affidavit in which he averred:

> That prior to the start of court on April 18th, 2000 I asked my lawyer Richard Beuke, whether or not he had received the polygraph examiner's worksheets From the State, to which he replied: "No."

[Docket 1-2 at 105].

Dole has not described to this Court any extraordinary circumstance that stood in the way of his filing a federal habeas petition between May 2012 (the latest date on which the 1-year statute of limitations could have begun to run) and the date he filed his petition in 2015.  During that time, he managed to file with the Circuit Court of Cook County his request for leave to file a successive post-conviction petition.  "Mistakes of law or ignorance of proper legal procedures are not extraordinary circumstances warranting invocation of the doctrine of equitable tolling." *Arrieta v. Battaglia*, 461 F.3d 861, 867 (7th Cir. 2006).  Equitable tolling does not save his petition from being untimely.

Accordingly, the Court agrees with defendant that Dole's habeas petition was untimely.[3] It is dismissed with prejudice.

---

[3]     Dole also states that the Court should consider his petition due to his actual innocence. [Docket 31 at 24].  The argument is so poorly developed that it is waived, but it also fails on the merits.  Dole argues that his evidence "raises serious doubts about the veracity" of Hernandez and Steffen and, together with Dole's "persistent claims of innocence," should convince the Court to ignore the procedural default, a la *McQuiggen*, 569 U.S. 383.  By Dole's "claims of innocence, his counsel means Dole's affidavit saying, "I was not involved in the murders of Jose Segura or Jose Romero."  [Docket 31-1 at 2].

### C. Certificate of Appealability

Finally, Rule 11(a) of the Rules Governing Section 2254 cases requires the Court to consider whether to issue a certificate of appealability. Where, as here, a court denies a motion for procedural reasons, a "litigant seeking a COA must demonstrate that a procedural ruling barring relief is itself debatable among jurists of reason." *Buck v. Davis*, __ U.S. __, __, 137 S.Ct. 759, 777 (2017); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court does not think a reasonable jurist could debate whether Dole's petition was timely filed under § 2244(d)(1) or whether equitable tolling should apply. Accordingly, the Court denies a certificate of appealability.

---

"To pass through the actual-innocence gateway to merits review of a procedurally barred claim," Dole would need to convince this Court it is "more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016). Dole has not done so. Dole was convicted on an accountability theory, not for striking the fatal blows. Even without the testimony of Steffen and Hernandez, the jury still heard the testimony of Bueno, whose testimony Dole in no way challenges. Bueno's testimony not only placed Dole at the scene of the crimes while the victims were being beaten but also established Dole's role in covering up the crimes. Bueno testified that Dole drove her and the children to a hotel and told her to say that she and Hurtado had not left the apartment that night, if anyone asked. Bueno's testimony also established that Dole continued to associate with Hurtado after the crime: Bueno testified that Dole came to their home on April 10, 1998 to warn Hurtado that the police were looking for him. Dole did not report the crime; he fled to Florida.

### III.   CONCLUSION

For the reasons set forth above, the Court dismisses Dole's habeas petition with prejudice.  The Court denies a certificate of appealability.  Civil case terminated.

**SO ORDERED.**                                      **ENTERED: October 21, 2021**

 

_____
**HON. JORGE ALONSO**
**United States District Judge**